# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

========================
## NO. 03-05-00543-CV
========================

### Cindy Hebert and Shea Hebert, Appellants

### v.

### Donovan Neal Kokel, Appellee

=====================================================================
## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT
## NO. D-1-FM-02-005680, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING
=====================================================================

## M E M O R A N D U M   O P I N I O N

Cindy Hebert and Shea Hebert appeal the district court's judgment, after a bench trial, appointing Donovan Neal Kokel as a possessory conservator of T.D.B., a child who was born during his marriage to Cindy Hebert but is not his child. In two points of error, the Heberts contend that the district court deprived them of their constitutional rights by continuing contact between T.D.B. and Kokel, and erred in imposing a geographic restriction limiting the child's residence to Travis County and contiguous counties for a period of one year. For the reasons that follow, we affirm the judgment of the district court.

**BACKGROUND**

Donovan Kokel and Cindy Hebert began dating as teenagers in November 1989. They married in 1994. In the spring of 2001, Cindy had an affair with Shea Hebert, an employee at Kokel's wrecker company. In March 2001, Cindy and Kokel separated.

On September 10, 2001, Kokel served Cindy with divorce papers. Over the next few days, Cindy and Kokel reunited, and Kokel learned that Cindy was pregnant. At trial, Kokel testified that Cindy told him that she needed financial assistance, that she wanted to work out their problems, that she wanted Kokel to be the father figure in her son's life, and that Shea Hebert was now "involved" with another person. At a family event, Kokel and Cindy announced that they were reuniting and that Kokel was "going to be [T.D.B.'s] dad." Kokel was present at and participated in the birth of T.D.B. on January 1, 2002. For approximately two years, Kokel, Cindy, and T.D.B. lived together as a family unit, and T.D.B. knew only Kokel as his father.

Because Cindy had signed up for food stamps during the separation, in 2002, the attorney general's office instituted a paternity action against Shea Hebert. By letter, Cindy advised the State,

> After consulting with my attorney and on his advice I am writing you this letter to inform you that there is a possibility, somewhat unlikely, but still a possibility that my husband of 8 years Donovan Neal Kokel is the father of this child. It was brought to my attention that because I was married during the conception and birth of this child that legally this child is considered his. We were separated for a brief period, but have come to reconcile the relationship.

Kokel had believed he was unable to conceive a child. The results of paternity testing excluded Kokel as the father. On January 30, 2003, the court rendered a default order finding Shea Hebert to

be the child's biological father, appointing him as T.D.B.'s possessory conservator, and granting to him visitation rights. Until the order, Shea Hebert had never seen or had contact with T.D.B., and he did not exercise his visitation rights for the first twenty-three months of T.D.B.'s life.

At the end of 2003, Shea Hebert began exercising his visitation rights and, at the same time, rekindled his relationship with Cindy. The relationship between Kokel and Cindy began to deteriorate. On January 30, 2003, Cindy and Kokel separated, and Cindy, taking the child, moved in with Shea Hebert. Kokel had frequent visitation with T.D.B. until March 2004 when Cindy discontinued Kokel's visits.

Kokel filed suit in March 2004, seeking appointment as a possessory conservator of T.D.B. with visitation rights. Kokel and Cindy were divorced in a separate suit, and Cindy married Shea Hebert in July 2004. The district court issued temporary orders in this case appointing a guardian *ad litem*, appointing Kokel as a possessory conservator of the child, and directing that regular visitation resume.

After a bench trial, the district court ruled in favor of Kokel, finding that it was in the best interest of T.D.B. to appoint Kokel as a possessory conservator, and granted Kokel, the only person T.D.B. had known as his father for the first two years of his life, visitation rights. The court also ordered a one-year restriction limiting the child's residence to Travis County and contiguous counties. The district court issued, *inter alia*, the following findings of fact:

4. Petitioner has been involved consistently and substantially in the child's life since his birth.

5. For approximately the first year and one-half of the child's life, Petitioner alone was in the role of father of the child, was held out as such by Petitioner and the

3

child's mother, and provided support to the child that was not provided by the biological father.

6. A strong parent-child bond exists between the child and Petitioner.

7. Severing the relationship and bond that exists between the child and Petitioner would entail a substantial risk of harm to the child's emotional well-being.

8. Appointing Petitioner as the non-parent permanent possessory conservator of the child is appropriate and such appointment would be in the best interest of the child.

9. The child will benefit from continued visitation and interaction with Petitioner on a regular and on-going basis and the same is in the best interest of the child.

10. The parties and the child would benefit from family therapy and from the continuation of Mr. Kokel's individual counseling, and the same is necessary and appropriate under the circumstances and is in the best interest of the child.

This appeal followed.


## ANALYSIS

As the biological parents of T.D.B., Cindy and Shea Hebert argue that the district court violated their constitutional rights as parents when it overrode their decision to discontinue contact between T.D.B. and Kokel. Citing *Troxel v. Granville*, 530 U.S. 57 (2000),[1] they contend

_____

[1] In *Troxel*, the Supreme Court held a grandparent access statute to be unconstitutional on the ground that it contravened the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 72 (2000). The *Troxel* case involved a lawsuit of paternal grandparents to obtain visitation with their grandchildren after their son had died. *Id.* at 60-61. Section 153.433 of the Family Code allows grandparents, under particular circumstances, to petition for access to a child, provided it is in the child's best interest. *See* Tex. Fam. Code Ann. § 153.433 (West Supp. 2005). The Heberts offer no other authority that supports their argument that *Troxel* is relevant here. For this reason, Kokel argues that they have waived their argument. *See* Tex. R. App. P. 38.1(h).

that the district court infringed on their right to control the care and custody of their child when it appointed Kokel as a possessory conservator and allowed visitation.

The Heberts do not dispute that the Texas Family Code expressly grants standing to Kokel to bring a suit affecting the parent-child relationship. *See* Tex. Fam. Code Ann. § 102.003(a)(9) (West Supp. 2005), § 156.002 (West 2002). Under section 102.003(a)(9), an original suit affecting the parent-child relationship may be filed by a person, other than a foster parent, who has had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition. *Id.* § 102.003(a)(9). In its findings of fact, the district court found that Kokel "had actual care, control and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of Petitioner's Petition to Modify Parent-Child Relationship." The Heberts do not challenge Kokel's standing and, in any event, we conclude that, based upon the record, Kokel established standing.

Moreover, the Heberts neither pleaded nor raised in the district court the point of error now raised for the first time on appeal. A constitutional attack must be raised in the trial court. *Dreyer v. Greene*, 871 S.W.2d 697, 698 (Tex. 1993). A party who participates in a proceeding without challenging its constitutionality may waive his right to question that proceeding. *Mercer v. Phillips Natural Gas Co.*, 746 S.W.2d 933, 936 (Tex. App.—Austin 1988, writ denied). The Heberts neither challenged the proceeding nor the statute authorizing the suit brought by Kokel. *See United States Reading Lab v. Brockette*, 551 S.W.2d 531, 532-33 (Tex. Civ. App.—Austin 1977, no writ). For this reason, they have waived the issue and we overrule their point of error.

In the final analysis, however, and in the interest of justice, we nevertheless address the best interest of the child, which is always the primary consideration of the court in determining questions of conservatorship and access to the child. Tex. Fam. Code Ann. § 153.002 (West 2002). We turn, then, to the question before the court at trial: the best interest of the child.

A trial court has wide discretion in determining the best interest of a child in family law matters such as custody, visitation, and possession. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *G.K. v. K.A.*, 936 S.W.2d 70, 72 (Tex. App.—Austin 1996, writ denied). We will reverse a trial court's order only if it appears from the entire record that the trial court abused its discretion, meaning it acted unreasonably, arbitrarily, or without reference to any guiding principles. *G.K.*, 936 S.W.2d at 72. There is no abuse of discretion if the decision is supported by sufficient, competent evidence. *Gillespie*, 644 S.W.2d at 451. That a trial court decides an issue differently than would an appellate court does not demonstrate an abuse of discretion; a trial court is in a better position than an appellate court to evaluate testimony and evidence and determine the child's best interest. *Wright v. Wright*, 867 S.W.2d 807, 816 (Tex. App.—El Paso 1993, writ denied). The trial court, as fact-finder, resolves conflicts in the evidence and determines the weight and credibility to give to witness testimony. *Schneider v. Schneider*, 5 S.W.3d 925, 931 (Tex. App.—Austin 1999, no pet.). A fact-finder's decision on conflicts in the evidence is generally viewed as conclusive. *Id*.

The record here contains ample evidence to support the district court's findings of fact as well as its conclusion that appointment of Kokel as a possessory conservator is in T.D.B.'s best interest. Although there is evidence to support the Heberts' argument against visitation, there is also evidence favoring Kokel's continued access to T.D.B. The Heberts have not shown that the

6

district court abused its discretion in allowing Kokel to have regular visitation with T.D.B. Moreover, the Heberts have not challenged any of the district court's findings of fact.

The bench trial occurred over three days. Eighteen witnesses testified, including Kokel, the Heberts, Kokel's parents, Cindy's father, and the guardian *ad litem*. Kokel testified that he was the general manager of Denver Towing, a family wrecker-service business. He explained that he learned that his wife was having an affair with his employee, Shea Hebert. When he served Cindy with divorce papers, they reconciled, and she told him that she was pregnant. He testified that she told him that she trusted him, needed him financially, and wanted him to be the father figure in T.D.B.'s life. When they decided to work out their problems and raise the child together, Kokel made the announcement at Cindy's father's birthday celebration that, "I am going to be [T.D.B.]'s dad." Kokel described how he was present at the child's birth and participated in it; saw T.D.B. every day, even when he was separated, until Cindy later cut off visitation; cared for T.D.B. every day because his business was close to T.D.B.'s home and allowed T.D.B. to spend time with him at work; and fed him lunch and dinner, gave him baths, and put him to bed:

> Seventy-five percent of the day every day [T.D.B.] spent with me. . . . I own my own business, that's part—I'm one of the owners, general manager. I run the business, so I am—you know, I pretty much have free reign as far as what I want to do. I take [T.D.B.] to work with me all the time. He would be at the shop. He—you know, he just—just as much a part of my life every day as getting up, walking or breathing. You know, he was there every day. I would give him—eat lunch with him, take him to lunch, give him his baths, put him to bed, feed him dinner. You know, I think I am probably the only person he would ever eat peas or spinach for.

Kokel also testified that he supported T.D.B. financially, that he always treated T.D.B. as his own child, and that Cindy encouraged his involvement in the child's life. Other witnesses testified to Kokel's character and their observations concerning his relationship with T.D.B.

The court-appointed guardian *ad litem* testified that discontinuing visitation between Kokel and T.D.B. would be harmful to the child and would impair his relationship not only with Kokel, but with Kokel's parents, grandfather, and others in the seemingly close-knit family who relate to T.D.B. through Kokel. He described the strong parent-child bond he observed existing between T.D.B. and Kokel. The guardian *ad litem* expressed an opinion as to which of the parties had demonstrated more stability:

> It appears to me that Mr. Kokel is the more stable of the two parties. And I'll base that on a couple of reasons. We've got Shea, Mr. Hebert, who, of course, loves his child, loves his wife. While she is pregnant, disappears, doesn't come back for two years later, or year and a half or so later. He's got three other children, which I don't know anything about because I wasn't allowed to investigate that. I have heard and I understand it came in a previous hearing that Mr. Hebert has a criminal history. Ms. Hebert goes back and forth, you know. Shea then it's back to Mr. Kokel, then back to Shea.
>
> Whereas, we've got Mr. Kokel, who is on a sizeable piece of land. He's got a very stable family and I think that we also have to remember that the kind of family that Mr. Kokel has is kind of what I think of as a subculture in our society. It's a—a wrecker subculture, that is how I put it like that. His father was a wrecker driver and his father before him was a wrecker driver. And they are kind of a different kind of people there. They kind of have a kind of mentality, wrecker-driver mentality. And they kind of hang together. . . . [H]is family is stable and I think they love one another. They are going to be there. They are going to be on that piece of property right there in north Austin. I don't think they're going anywhere.
>
> Whereas, I can't say that about Ms. Hebert. I cannot say that about Mr. Hebert.

Shea Hebert testified that Kokel is a bad influence on T.D.B.'s life and that he should not be around the child. He testified that Kokel is violent and that he had seen him beat a dog for chasing a cat. Hebert stated that when T.D.B. returned from his visits with Kokel he acted differently and had a "real bad temper." Hebert has seen Kokel "holler and scream" at children. Hebert explained that he has three other children with whom he exercises visitation. As the biological father, Hebert stated that he and his wife "should know what is best for our son, should be able to provide the best for our son, and be able to keep him out of any kind of harm or danger without having any third-party interference or even the Court's interfering in our life."

On cross-examination, Hebert admitted that he did not exercise visitation or have contact with T.D.B. during the first year and nine months of T.D.B.'s life, and that he "wasn't as willing to accept responsibility back then as I was when I came back and am now." Hebert testified that, when Kokel and Cindy separated for the second time in January 2004, he encouraged Kokel to continue visitation with T.D.B. He recognized that there was a bond between T.D.B. and Kokel, "but not one that was strong enough that couldn't be changed." Hebert believed that he cooperated with the guardian *ad litem*'s investigation, but acknowledged that he followed his attorney's advice and refused to submit to drug testing. Cindy Hebert testified concerning expenses and attorney's fees.

Steve Boyd, Cindy's father, also testified. He stated that he had known Kokel for most of Kokel's life and had lived close to Kokel and Cindy when they were married. He described the birthday party during which he learned he was going to be a grandfather. Although he had moved out of town, he remained in contact with Kokel and his daughter and had frequent contact

9

with T.D.B., his only grandchild. Boyd observed a strong bond between Kokel and T.D.B. and testified that he has no objections to Kokel continuing a role in T.D.B.'s life. Boyd explained that he is now estranged from Cindy. Because Kokel's visitation has been curtailed, Boyd has been unable to interact with T.D.B.

At the close of the evidence, the district judge observed:

> First let me say that this is about the best interest of [T.D.B.]. . . . I do believe all the parties, all the adult parties, love this child. I think that all the adults in this case have flaws and there are facts and disputes regarding some of those allegations.
>
> What's not in dispute is that none of these parties are—adult parties have physically harmed this child nor is there any evidence that there's a high risk that they will, or that there's a significant risk or even a moderate risk that they will. A number of the experts have talked about best interest of the child being stability. I take this as stability in placement, environment and parenting. I think what is evident is that Ms. Hebert has changed her mind in her life more than once in ways that have directly and adversely affected this child, including who is to be considered the father, as well as whether a grandfather, her father, will have contact with the family.
>
> Mr. Hebert, likewise, for one year and nine months decided and stuck with his decision not to see, support or take responsibility for this child. The track record to date is about one half of [T.D.B.]'s life. Mr. Hebert has been involved in about one half. Mr. Kokel I do not see as having changed and made decisions with respect to this child that have changed since he's been aware of the impending birth. That includes through the changes that he did not make, including the wife's pregnancy by another man, her return, her request that he act as the child's father, that she allow him to be the primary or a primary caretaker for two years, and her decision then to leave and marry the man who had fathered the child.
>
> Now, Dr. Lewis has testified that she sees from what she can tell and was available to her a volatile relationship. Other than that expert we had individual lay people speak of a strong bond with Mr. Kokel. Dr. Lewis opined that Mr. Kokel may be the stabilizer in this relationship. I think that that is what the evidence shows at this point.

Addressing the Heberts, the judge expressed a lack of confidence that the Heberts would continue to be together and would raise T.D.B. together, otherwise he "would consider weaning [T.D.B.]." He then appointed Kokel as a possessory conservator with limited visitation rights.

There is sufficient competent evidence to support the district court's judgment, and the district court did not err in appointing Kokel as a possessory conservator with limited visitation rights. We overrule the Heberts' first point of error.

In their second point of error, the Heberts contend that the district court erred in imposing a geographic restriction on T.D.B. In its findings of fact, the court found that "temporary restriction on the child's domicile to Travis County and counties contiguous to Travis County is necessary and appropriate and would facilitate the parties' participation in family therapy and is in the best interest of the child." Because the court's one-year restriction limiting the child's residence to Travis County and contiguous counties expired on April 16, 2006, the issue is moot, and we will not address it.

## CONCLUSION

Having overruled the Heberts' first point of error, we affirm the judgment of the district court in all respects.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Pemberton

Affirmed

Filed: August 11, 2006

11